# Exhibit 2

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Patent No.: 10,259,470 | |
| Application No.: 90/015,287 | |
| Filed: 08/31/2023 | Art Unit: 3992 |
| Inventor: Phelan | |
| Title: DRIVER AUTHENTICATION SYSTEM AND METHOD FOR MONITORING AND CONTROLLING VEHICLE USAGE | Examiner: Wassum, Luke S. |

Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450
Fax: (571) 273-9900

Dear Sir/Madam:

## <u>RESPONSE TO MAY 23, 2024 FINAL OFFICE ACTION</u>

Responsive to the Final Office Action dated May 23, 2024, the Patent Owner presents the following in complete response pursuant to 37 C.F.R. § 1.550.  Attached to this Response are the following:

**Amendments to the Claims** are unnecessary given the remarks.  No claim amendments are made herein as discussed on page 2 of this paper.

**Remarks** begin on page 3 of this paper.

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

## CLAIM AMENDMENTS

Based on the remarks below, no claim amendments are necessary to put this application in condition for allowance and issuance of a reexamination certificate for United States Patent No. 10,259,470 ("'470 Patent").

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

## REMARKS

Applicant submits that challenged claims 1 and 4 of the '470 Patent along with all unchallenged claims of the '470 Patent are allowable.

## STATUS OF THE CLAIMS

Claims 1 and 4 of the '470 Patent were rejected in the May 23, 2024 Final Office Action. Claims 1 and 4 were rejected under 35 U.S.C. § 103 as being rendered obvious by Cherouny in view of Harter. Claim 1 was rejected under 35 U.S.C. § 103 as being rendered obvious by Cherouny in view of Shuman. Claim 1 was rejected under 35 U.S.C. § 103 as being rendered obvious by Cherouny in view of Petrik. Claim 1 was rejected under 35 U.S.C. § 103 as being rendered obvious by Cherouny in view of Bouchard.

## BACKGROUND OF THE '470 PATENT

The '470 Patent is "generally related to techniques for use in ensuring motor vehicle operation safety." '470 Patent at 1:32-33. More specifically, it relates "to systems and methods for monitoring and controlling vehicle usage by high-risk drivers." '470 Patent at 1:33-35. "A proprietary and centralized database comprising a software application can be accessed by an authorized user via a network utilizing a remote computer in order to configure a desired operating profile

PAGE 4/32 * RCVD AT 7/23/2024 6:07:57 PM [Eastern Daylight Time] * SVR:W-PTOFAX-DTS-E1/19 * DNIS:2739900 * CSID:15127276691 * ANI:3055037548 * DURATION (mm-ss):18-56

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

that matches requirements of the high-risk driver." '470 Patent at 2:37-41. The '470

Patent explains:

> The operating profile can be loaded to a driver
> identification and data logging module in conjunction with
> the remote computer. A master control unit can receive a
> unique identification code from the data logging device to
> authenticate the high-risk driver and to operate the vehicle
> within the desired operating profile. A slave control unit
> receives commands from the master control unit and
> generates a real time alarm signal if the driver violates the
> preprogrammed operating profile unique to the driver.
> The alarm signal generated by the slave control unit can
> remain until the driver corrects the operating condition and
> brings the vehicle within the desired operating profile.

'470 Patent at 2:41-53.

Central to the teachings of the '470 Patent, and claim 1 in particular, are the

claimed relationship between two control units, namely the "master control unit"

and the "slave control unit." Both are ***control units***, meaning that they have certain

characteristics known to a person of skill in the art, including the ability to

communicate, process data and control features of the claimed system. Moreover,

both are ***units***, not combinations of devices created with the claims in mind to meet

the control units' limitations.

A "controller" in the context of a computerized system such as the "vehicle

control system" of claim 1 is defined in the IEEE Dictionary as follows:

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

(2) A device or group of devices that serves to govern, in some predetermined manner, the electric power delivered to the apparatus to which it is connected.

(3) (packing machinery) A device or group of devices that serves to control in some predetermined manner the apparatus to which it is connected.

(4) The component of a system that functions as the system controller. A controller typically sends program messages to and receives response messages from devices.

*IEEE 100: The Authoritative Dictionary of IEEE Standards Terms*, edited by Kim

Breitfelder and Don Messina, Seventh Ed., Standards Information Network IEEE

Press, December 2000, p. 234.

As explained in the specification of the '470 Patent:

The system **450** generally includes a master control unit **430** and a slave control unit **440** that can be accessed and programmed via the software application module **260** stored in the proprietary and centralized database.

'470 Patent at 6:8-13.

PAGE 6/32 * RCVD AT 7/23/2024 6:07:57 PM [Eastern Daylight Time] * SVR:W-PTOFAX-DTS-E1/19 * DNIS:2739900 * CSID:15127276691 * ANI:3055037548 * DURATION (mm-ss):18-56

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action



'470 Patent at Fig. 6. "When the driver enters the vehicle, the device **425** can automatically, or at the user's request, connect to the master control unit **465**." '470 Patent at 7:37-39.

As a programmable controller, the slave control unit's output can take varied and complex forms, including remote communication relating to vehicle operation by an interested party such as a fleet manager or other owner.

> The master control unit **430** can enable vehicle operation within the programmed operating profile **435**. If the driver **410** violates the preprogrammed operating profile **435** the master control unit **430** can communicate with the slave control unit **440** and generate a real time driver alarm signal **445**. The alarm signal **445** can result in an actual audible alarm, or it can be used to control/govern operational aspects of the vehicle. *For example, the real time driver alarm signal 445 can be used to communicate conditions to the driver, limit/disable radio functionality, limit/disable mobile cellular devices*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

**in the vehicle, limit/disable internet applications provided in the vehicle, limit/disable GPS related applications provided by the vehicle, limit/disable the drivers cellular telephone or other such devices in the vehicle, govern mechanical operations (e.g., lower/limit speed), remotely contact vehicle owners/fleet managers, and other electrical or mechanical functions, while maintaining driver and occupant safety.**

*Id.* at 10:48-61 (emphasis added).

## CLAIM CONSTRUCTION

The Examiner observes that the Patent Owner did not act as his own lexicographer, and that no claim terms are subject to 35 U.S.C. § 112(f) or pre-AIA 35 U.S.C. §112, sixth paragraph. May 23, 2024 Final Office Action at 5-6. Consequently, the Examiner did not construe any claim term in the subject claims. Patent Owner respectfully disagrees with that approach. However, acting as a lexicographer is not the only instance in which claim construction is critically important to a validity analysis.

The law is well settled that claim construction is required to ascertain validity under 35 U.S.C. §102 and §103 and infringement, regardless of whether or not the broadest reasonable interpretation standard is applicable, as it is here. *In re Yamamoto.* 740 F.2d 1569, 1571 (Fed. Cir. 1984).

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

First, under any reasonable interpretation, the master control unit and the slave control unit must have a master and slave relationship as specified in the claims—those words are part of the subject claim terms, and have a technical meaning to a person of ordinary skill in the art. '470 Patent at 2:41-53; 6:8-13; 10:48-61; FIG. 6; Claim 1. That is borne out in the specification, and consistent with it, the claims and the figures. '470 Patent at 2:41-53; 6:8-13; 10:48-61; FIG. 6; Claim 1.

Secondly, the master control unit and slave control unit must in fact be control units. Here again, those terms are set forth verbatim in the claim language, and have a meaning to a person of ordinary skill in the art. '470 Patent at 2:41-53; 6:8-13; 10:48-61; FIG. 6; Claim 1. Controlling case law also mandates that conclusion, as explained below. These control units must control the claimed features.

## CLAIM REJECTIONS

### Ground 1 Under 35 U.S.C. § 103 (Cherouny in View of Harter)

The combination of Cherouny and Harter is improper in the absence of evidence that an artisan would be motivated, rather than discouraged, from combining in the manner claimed. *See Tris Pharma, Inc. v. Actavis Lab'ys FL, Inc.*, 2022 WL 2525318, at *5 (Fed. Cir. July 7, 2022); *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1067 (Fed. Cir. 2020) (affirming a district court's finding of no motivation to combine where the district court "properly weighed the evidence

*Page 8 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

presented and concluded as a matter of fact that a [skilled artisan] would be dissuaded from selecting or combining the components as claimed"); *see also Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1379 (Fed. Cir. 2017).

The Examiner correctly notes that "Cherouny does not explicitly teach a vehicle control system wherein the various system modules, including the identification and data logging module, communicate via wireless means." May 23, 2024 Final Office Action at 18. On the contrary, Cherouny teaches secure wired communication with dummy wires to prevent tampering.

More specifically, Cherouny teaches against wireless communication between the alleged data logging module and identification module. Moreover, it teaches away from a simple *wired* configuration, and teaches a very specific implementation, for security purposes.

> In the prior art devices, there was no way to make a record to guide decisions about future programming. The present device allows for a driver to pass a controlled number of occurrences but at some point that ability will be curtailed. If the driver has a bad record the ability to "pass" will be limited or denied. In addition, it would be easy to by-pass the prior art system by hot wiring around it. In the instant invention, the wiring harness has decoy wiring that forms a loop through all the various electronic modules. If the looped wire that threads through all of the modules is

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

broken for even a moment the event is recorded and
documented.

Cherouny at ¶33. Therefore, it would not have been "obvious to try" modifying

Cherouny with Harter's disclosure of a wireless device because that is taught against

by Cherouny itself.

Limitation 1(b)

Cherouny does not disclose a "master control unit" as properly construed.

Examiner alleges that Cherouny discloses:

> b) **a master control unit in a vehicle for authenticating
> at least one occupant via said driver identification and
> logging module and associating an operating profile
> with said at least one occupant** (see microprocessor 101
> which connects to key fob reader 109 to check the identity
> of the user of the automobile to ensure the instant user's
> data table is used, [0073]; see also disclosure that a
> moderator can preprogram operational parameters [i.e., an
> operating profile for an individual driver in its system,
> [0018] and [0020]).

May 23, 2024 Final Office Action at 16-17.

The Examiner argues that "there does not appear to be an allegation that

Cherouny does not disclose the claimed master control unit, only that it is

implemented differently." May 23, 2024 Final Office Action at 9. That assertion is

incorrect. Bilateral communication is required between a master control unit and a

slave control unit. That is claimed and stated clearly in the prosecution history.

*Page 10 of 30*

Amendment, Reply and Request for Reconsideration dated February 6, 2012 at 10 ('415 Patent Prosecution History-related patent to the '470 Patent) (emphasis added).

The '470 Patent's master control unit is designed to identify a driver profile in which the vehicle operates and for controlling various vehicle system components and has all the necessary features on-board a singular device versus the highly "componentized" approach taught by Cherouny. For example, the master control unit 430 of the '470 Patent includes a driver identification and validation module 502, a GPS antenna processing module 504, a master micro controller/processor 506, a memory module 508 and a function indicators module 510. '470 Patent at FIG. 6.

The communications interfaces of the master control unit 430 depicted in the specification include outputs such as starter enable 518, alarm enable 516, and internal definable outputs 512. The inputs include clean power 520 and other internal definable inputs 514. '470 Patent at 10:48-11:52; FIG. 6.

The master control unit is to be understood in a specific systemic context, namely its relationship to the "slave control unit" claimed in claim 1 and discussed in "Limitation 1(e)" below. The master control unit and slave control unit "communicate," as set forth in claim 1. *See also* IEEE 100 Authoritative Dictionary, "master": "a device that initiates communications requests to gather data or perform

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

controls." As stated in prosecution, "the master and slave control units claimed work in parallel and ***thus require bidirectional communication***." Amendment, Reply and Request for Reconsideration dated February 6, 2012 at 10 ('415 Patent Prosecution History) (emphasis added).

Cherouny, in contrast, discloses a microprocessor that performs calculations and processes data based on inputs. These inputs include inputs from an automobile speed sensor 108, a key fob reader 109, and power conditioning 110. Cherouny at [0073], FIG. 20A. The microprocessor in turn provides simple instructions to peripheral components to execute functions such an audible noise generator 121, which Examiner identifies as a "slave control unit." *Cf.* Cherouny at [0077], [0078], FIG. 20A.

As set forth in more detail in connection with Section 1(e) ("slave control unit"), a control unit is a term of skill in the art. Likewise, a "master" and "slave" relationship is well understood, and the intrinsic record is clear that bidirectional communication is required. These terms are understood in the context of the specification, which supports a construction of "master control unit" that requires bidirectional communication. There is no communication received from the noise generator in Cherouny.

Limitation 1(c)

Case 1:25-cv-01399-SEG    Document 43-3    Filed 07/31/24    Page 14 of 30

To: Mail Stop "Ex Parte Reexam" Central Reexamination Unit    Page 14 of 32    2024-07-23 22:07:48 GMT    15127276691    From: Adam Price

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

Cherouny does not disclose receiving location and speed information "***in association with a movement of a vehicle***."

Examiner asserts that Cherouny discloses:

> c) **a module for receiving at least location and speed information in association with a movement of said vehicle** (see disclosure of speed sensor 108, [0073]; see also disclosure of a global positioning receiver linked to the CPU that receives the location of the vehicle from the GPS satellite system, [0020]; see also disclosure of a wireless transmitting means associated with the moderator to send signals representing location and speed data of the vehicle at any given time to a central server, claim 1).

May 23, 2024 Final Office Action at 17.

Examiner alleges that "[t]he limitation also merely recites the receipt of <u>speed information</u> and <u>location information</u>" and "[t]here is no limitation regarding the mechanism for deriving said information." May 23, 2024 Final Office Action at 11. Patent Owner disagrees. This limitation of the '470 Patent requires that speed and location information are received "***in association with a movement of said vehicle***." Patent Owner respectfully notes that Examiner has not addressed this portion of the limitation. Cherouny discloses that speed information is determined ***not*** from "movement of said vehicle," but rather clock cycles associated with wheel sensors. Cherouny never uses vehicle movement to determine speed. On the contrary, Cherouny states:

*Page 13 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

> *The instant device counts clock cycles between rising edges as well as any other part*, such as the falling edges or even voltage levels, of the square wave coming from an additional wheel sensor similar to the antilock ABS sensors on one of the wheels. This digital computer *version of speed detection is unique when used with the other features of the device.*

Cherouny at [0011], [0015] (emphasis added).

Hence, Cherouny's methodology for estimating speed—clock cycles and wheel rotation—does not teach or suggest this claim limitation. Cherouny's sole mention of GPS is so that the system can be made aware of school zones. Cherouny at [0010], [0020]. Cherouny never teaches or suggests using GPS to determine speed and location based on vehicle movement.

<u>Limitation 1(d)</u>

Cherouny does not disclose a separate "data logging device" and "identification and data logging module."

Examiner asserts:

> d) **a data logging device that records vehicle operation data associated with a use of said vehicle, the vehicle operation data comprising at least said speed information received from said module\*** (see disclosure that the system records the driving speed over a given period of time, [0036]; see also disclosure that the system shows a daily driving record, and measures car speed and provides data logs of time and severity of infraction [i.e., car speed that is over the defined speed limits], [0080]-[0081]).

*Page 14 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

May 23, 2024 Final Office Action at 17.

Examiner argues that "[c]laiming the hardware and software components separately (such as the current claim 1) as opposed to a single component combining hardware and software (such as Cherouny's disclosed car monitor 170) does not impart patentability when all of the claimed functionality is carried out be the disclosed combined hardware/software component." May 23, 2024 Final Office Action at 12. However, Examiner fails to address the United States Patent and Trademark Office and Federal Circuit decisions related to this issue discussed in Patent Owner's April 15, 2024 Response to the Non-Final Office Action and included again below for Examiner's convenience.

In particular, the PTAB has determined that it would be "problematic" to rely on one component of a prior art reference as teaching two separate components of a claim. In *Hopkins*, the PTAB held that the prior art disclosure of an accelerometer with an output signal could not be applied as teaching both a "deceleration signal" and an "inclination signal" as claimed. H*opkins Manufacturing Corp. v. Cequent Performance Products, Inc.* (IPR 2015-00613, Paper 9, August 7, 2015).

As previously argued but unaddressed, according to *Becton*, "[w]here a claim lists elements separately, 'the clear implication of the claim language is that those

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

elements are distinct component[s]' of the [claimed] invention." *Becton, Dickinson and Co. v. Tyco Healthcare Gr., LP*, 616 F.3d 1249 (Fed. Cir. 2010). Where a claim provides for two separate elements (*e.g.*, a "second portion" and a "return portion"), these two elements "logically cannot be one and the same." *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1298 (Fed. Cir. 1996).

Therefore, it is improper to rely on the same structure (car monitor 170) of a prior art reference as teaching the two separate claim elements (a data logging device and an identification and data logging module) of claim 1 of the '470 Patent, without at a minimum identifying how they are distinctly present.

Limitation 1(e)

Cherouny does not disclose a "slave control unit" when that phrase is properly construed under any standard. A slave control unit is by definition *a control unit* that a POSITA would understand has certain characteristics. The Examiner has read this term out of the patent claim altogether, which is contrary to governing caselaw of the PTAB applying the BRI standard for this term.

Examiner alleges that Cherouny discloses:

> e) **a slave control unit in said vehicle and which communicates with said master control unit, wherein said slave control unit receives commands from said master control unit and generate an alarm signal** (see disclosure of engine slow down module 120 and audible

> noise generator 121, [0077]-[0078] and Figs. 20A & 20B;
> see also disclosure that functions of the driver monitor
> include engine slowdown 181 and audible noise alarms
> 182, [0082] and Figs. 21A & 21B; see also disclosure of
> the possible audio alarms, [0021]-[0024] and [0031]).

May 23, 2024 Final Office Action at 17-18.

The Examiner also makes the following claim:

> The Office initially notes that Patent Owner is reading
> limitations from the specification into the claims. For
> instance, there is nothing in the claims with respect to
> programmability of the claimed 'slave control unit', and
> nothing in the claims with respect to communication from
> the slave control unit to the master control unit.

May 23, 2024 Final Office Action at 13. This is incorrect and contrary to established law.

A slave control unit is a type of control unit. That should be apparent based on the plain and ordinary meaning of the claims and the intrinsic record. The Examiner reading out the phrase "control unit" from "slave control unit" constitutes plain error. Patent claims should be construed to avoid rendering claim terms superfluous. *Digital-Vending Services International, LLC v. University of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012). For example, when a claim refers to "steel baffles," this "strongly implies that the term 'baffles' does not inherently mean

objects made of steel." *Phillips v. AWG Corp*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).
That truism applies under any claim construction standard.

A control unit incorporates a controller. These take the form of a processor or microcontroller. *IControl Networks, Inc. v. Zonoff Inc.*, No. CV 14-1199-GMS, 2016 WL 1437892, at *1 (D. Del. Apr. 11, 2016) (construing "control unit" to require a programmable processor); *Glaston Corp. v. Salem Fabrication Techs. Grp.*, No. 1:21-CV-942, 2024 WL 1673273, at *17 (M.D.N.C. Apr. 18, 2024) (successfully arguing that "control units or controllers" are well-recognized structural units in patent law that a POSA would understand); *Capella Photonics, Inc. v. Fujitsu Network Commc'ns, Inc.*, No. 2:20-CV-00076-JRG, 2021 WL 465430, at *22 (E.D. Tex. Feb. 9, 2021) (a "control unit" refers to known structure, "namely a controller" such as a computer processor).

For this reason, and ***applying the BRI standard***, the PTAB has held that a controller ***must*** include ***a processor*** and ***be programmable***.

> The Board interprets claims in an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[ ]." 37 C.F.R. § 42.100(b). Under this standard, we interpret claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description

Case 1:25-cv-01399-SEG   Document 43-3   Filed 07/31/24   Page 20 of 30

To: Mail Stop "Ex Parte Reexam" Central Reexamination Unit          Page 20 of 32   2024-07-23 22:07:48 GMT          15127276691          From: Adam Price

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

contained in the applicant's specification." *In re Morris*,
127 F.3d 1048, 1054 (Fed. Cir. 1997); *see In re Smith Int'l,
Inc.*, 871 F.3d 1375, 1382–83 (Fed. Cir. 2017).

*One World Techs., Inc. v. Chamberlain Grp., Inc.*, No. IPR2017-00073, 2018 WL
1960893, at *3–4 (P.T.A.B. Apr. 24, 2018).

The PTAB further observed that "broadest reasonable interpretation ... is an
interpretation that corresponds with what and how the inventor describes his
invention in the specification."

> Our interpretation "'cannot be divorced from the
> specification and the record evidence,' and 'must be
> consistent with the one that those skilled in the art would
> reach.' A construction that is 'unreasonably broad' and
> which does not 'reasonably reflect the plain language and
> disclosure' will not pass muster." *Microsoft Corp. v.
> Proxyconn*, Inc., 789 F.3d 1292, 1298 (Fed. Cir. 2015)
> (citations omitted), overruled on other grounds by *Aqua
> Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017).
> In the Decision on Institution, based on the parties'
> arguments, see Pet. 13–32; Paper 6, 5–16, and record at
> the time, we preliminarily interpreted the following
> limitations of claim 1:
> ***"controller": a microprocessor, processor, or other
> programmable logic*** that controls the operation of the
> barrier movement operator**.**

*Id.*

In view of the proper construction of "slave control unit," the Examiner's
identification of a soundmaker as a "slave control unit" is in error.   Properly
construed, it is not a slave control unit.   It has no processor and is not programmable.

*Page 19 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

While Phelan pointed out that these terms required construction, neither the request nor the Examiner provide a construction of the terms "master control unit" or "slave control unit." A POSITA would, in view of the teachings of the specification and claims, understand a "slave control unit" in the context of its required communication with a "master control unit." Both contain processors and are programmable, as set forth in the intrinsic record and discussed below.



FIG. 5

*Page 20 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

The "slave control unit" 440 itself has a microprocessor and can be programmed.

> The system 450 generally includes a master control unit 430 and a slave control unit 440 that can be accessed and programmed via the software application module 260 stored in the proprietary and centralized database 370.

'470 Patent at 6:8-12; *accord* 8:9-24. The slave control unit processes inputs from sensors:

> The slave control unit **440** can process the data collected from the sensors and determine if the data indicates a condition that requires a warning. For example, the sensors may indicate that the vehicle is speeding, veering off the road, approaching an obstruction in the road, too close to another vehicle, that the vehicle driver is distracted, sleepy, or not paying attention, that the vehicle driver is impaired etc. If one of these conditions is identified, the slave control unit **440** signals the master control unit **430** and the master control unit issues a driver alarm signal **445** as described above. In the case where the impairment sensor **462** provides a signal to the slave control unit **440** indicating that the driver's impairment is above a prescribed limit, the slave control unit can prevent the vehicle from starting.

'470 Patent at 8:43-56; 10:48-61.

The Examiner contends that the microprocessor 101 is the "master control unit" and appears to argue that engine slow down module 120 and audible noise generator 121 together form the "slave control unit." Rather than being a "unit," as

*Page 21 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

claimed, the slow down module 120 and audible noise generator 121 are not even

depicted as being in communication with one another.



FIG. 20B

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

Cherouny at Fig. 20B.  There is no teaching of any programmability of audible noise generator, no communication of any kind to the engine slow down, and no function other than making a noise based on an input signal.  Cherouny at [0078].

The Examiner does not appear to contend that engine slow down module 120 generates an alarm signal as required by the claim language.  The only disclosure remaining is audible noise generator 121, which as indicated by the name, is a simple noise generator:

> [0078]  An audible noise generator **121** is also connected to the microprocessor for provision of various warning noises such as a quick chirp, a pulsed beep and a continuous noise.  These provide warnings of increasing severity to the driver of the vehicle.

Cherouny at 6 [0078].  This does not meet the requirements of the slave control unit when it is properly construed as discussed *supra*.

Claim 4

Claim 4 is allowable for the same reasons previously discussed.  Because it is a dependent claim, and thereby incorporates all of the limitations of independent claim 1 from which it depends, the disclosure lacking in Cherouny related to the independent claim limitations discussed herein prevent the combination of Cherouny and Harter from rendering dependent claim 4 obvious.

### Ground 2 Under 35 U.S.C. § 103 (Cherouny in View of Shuman)

To: Mail Stop "Ex Parte Reexam" Central Reexamination Unit                 From: Adam Price

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

Ground 2 is predicated on a combination of Cherouny and Shuman. As a preliminary matter, the combination of these references is improper. The Examiner concedes that "Cherouny does not explicitly teach a vehicle control system wherein the various system modules, including the identification and data logging module, communicate via wireless means." May 23, 2024 Final Office Action at 27. Indeed, Examiner cites neither Cherouny nor Shuman as disclosing a wireless communication system. The Examiner asserts without evidence, however, that a skilled artisan would have been generally motivated to modify Chorouny with Shuman to fabricate a wireless communication system in the manner claimed. May 23, 2024 Final Office Action at 27.

That is improper in the absence of evidence that an artisan would be motivated, rather than discouraged, from combining in the manner claimed. *See Tris Pharma, Inc. v. Actavis Lab'ys FL, Inc.,* 2022 WL 2525318, at *5 (Fed. Cir. July 7, 2022); *Immunex Corp. v. Sandoz Inc.,* 964 F.3d 1049, 1067 (Fed. Cir. 2020) (affirming a district court's finding of no motivation to combine where the district court "properly weighed the evidence presented and concluded as a matter of fact that a [skilled artisan] would be dissuaded from selecting or combining the components as claimed"); *see also Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.,* 853 F.3d 1370, 1379 (Fed. Cir. 2017).

PAGE 25/32 * RCVD AT 7/23/2024 6:07:57 PM [Eastern Daylight Time] * SVR:W-PTOFAX-DTS-E1/19 * DNIS:2739900 * CSID:15127276691 * ANI:3055037548 * DURATION (mm-ss):18-56

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

More specifically, Cherouny teaches against wireless communication between the alleged data logging module and identification module. Moreover, it teaches away from a simple *wired* configuration, and teaches a very specific implementation, for security purposes.

> In the prior art devices, there was no way to make a record to guide decisions about future programming. The present device allows for a driver to pass a controlled number of occurrences but at some point that ability will be curtailed. If the driver has a bad record the ability to "pass" will be limited or denied. In addition, it would be easy to by-pass the prior art system by hot wiring around it. In the instant invention, the wiring harness has decoy wiring that forms a loop through all the various electronic modules. If the looped wire that threads through all of the modules is broken for even a moment the event is recorded and documented.

Cherouny at ¶33.

Similarly, the profile information is kept inaccessible to the driver and is hardwired in a specific manner.

> The instant device utilizes input selector codes. The data is not coded going through the infrared link. It is literal data describing the numerous profiles of all the drivers under all the different driving conditions. The profile is set up in the instant device and inaccessible to the driver.

Cherouny at ¶30.

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

In short, there is no evidence in the record that an artisan would have been motivated to combine Cherouny and Shuman in the manner claimed, particularly when Cherouny teaches against such an implementation.

The arguments in Ground 1 also apply to this rejection.

### Ground 3 Under 35 U.S.C. § 103 (Cherouny in View of Petrik)

Ground 3 is based on Cherouny in view of Petrik. Here again, Examiner cites neither Cherouny nor Petrik as disclosing a wireless communication system, relying only on a general statement that a POSITA would know how to implement a system wirelessly. May 23, 2024 Final Office Action at 33. For the same reasons discussed in Grounds 1 and 2, a POSITA would not have been motivated to combine Cherouny and Petrik in the manner claimed, particularly when Cherouny teaches against wireless communication.

The Examiner also acknowledges that "Cherouny does not explicitly teach a vehicle control system wherein the data logging device records location information." May 23, 2024 Final Office Action at 35.

Petrik teaches an individual driver logbook for each driver in the form of a smart card. "Drivers are issued with their logbook smart cards with their fingerprint template recorded in the card." Petrik at ¶22. "At the start of the journey the driver inserts his smart card into the unit's smart card reader/writer and places his finger

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

on the fingerprint reader to confirm his identity. This automatically logs him in as the current driver and enables engine ignition." *Id.* At ¶23. The unique smart card approach of Petrik could not be combined with Cherouny, which teaches storing calculated speed information in a secure location, hardwired in the vehicle. Cherouny at ¶33. It is inappropriate to use the template provided by the inventor to render the inventor's contribution obvious. *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1271 (Fed. Cir. 2018) (citing *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed. Cir. 1985) ("The invention must be viewed not with the blueprint drawn by the inventor")).

The arguments in Ground 1 also apply to this rejection.

### Ground 4 Under 35 U.S.C. § 103 (Cherouny in View of Bouchard)

Ground 4 is based on Cherouny in view of Bouchard. Here again, Examiner cites neither Cherouny nor Bouchard as disclosing a wireless communication system, relying only on a general statement that a POSITA would know how to implement a system wirelessly. May 23, 2024 Final Office Action at 39. For the same reasons discussed in Grounds 1 and 2, a POSITA would not have been motivated to combine Cherouny and Bouchard in the manner claimed, particularly when Cherouny teaches against wireless communication.

PAGE 28/32 * RCVD AT 7/23/2024 6:07:57 PM [Eastern Daylight Time] * SVR:W-PTOFAX-DTS-E1/19 * DNIS:2739900 * CSID:15127276691 * ANI:3055037548 * DURATION (mm-ss):18-56

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

The Examiner also acknowledges that "Cherouny does not explicitly teach a vehicle control system wherein the data logging device records location information." May 23, 2024 Final Office Action at 35.

Here again, a review of Bouchard demonstrates that the two approaches of Cherouny and Bouchard are fundamentally inconsistent, and an artisan would not be motivated to combine one with the other. Bouchard is a vehicular *radar* system. Directly contrary to Cherouny, it also teaches a removable storage device.

> A removable, externally readable, non-volatile solid-state memory event recording apparatus (ERA)5 is coupled to the system processor 107. The ERA records the output of each of the sensors and information about targets detected by the radar system.

Bouchard, 8:43-48. The removable memory approach of Bourchard could likewise not be combined with Cherouny, which teaches storing calculated speed information in a secure location, hardwired in the vehicle. Cherouny at ¶33.

The arguments in Ground 1 also apply to this rejection.

## CONCLUSION

In light of the foregoing remarks, the Patent Owner respectfully requests the Office to withdraw the pending rejection to claims 1 and 4 of the '470 Patent. If any outstanding issues remain, the undersigned would welcome an Applicant interview with the Office to expedite the resolution of this application.

*Page 28 of 30*

United States Patent Application No. 90/015,287
Response to May 23, 2024 Final Office Action

Date: July 23, 2024                     Respectfully submitted,

                                        /s/ *Gregory S. Donahue*
                                        Gregory S. Donahue
                                        Reg. No. 47,531
                                        DiNovo Price LLP
                                        7000 North MoPac Expressway
                                        Suite 350
                                        Austin, TX 78731
                                        Telephone: (512) 539-2625
                                        Facsimile: (512) 539-2627

PAGE 30/32 * RCVD AT 7/23/2024 6:07:57 PM [Eastern Daylight Time] * SVR:W-PTOFAX-DTS-E1/19 * DNIS:2739900 * CSID:15127276691 * ANI:3055037548 * DURATION (mm-ss):18-56